FILED
2022 Aug-18  AM 09:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| DEBRA PRESSNALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:20-cv-02000-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## <u>AFFIRMING THE DECISION OF THE COMMISSIONER</u>

Pursuant to 42 U.S.C. § 405(g), Plaintiff Debra Pressnall filed for review of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") on her claim for disability benefits. Doc. 1. Plaintiff Pressnall applied for disability benefits with an alleged onset date of January 1, 2018. Doc. 13-4 at 39, 41; Doc. 13-6 at 2, 9. The Commissioner denied Pressnall's claim for benefits. Doc. 13-3 at 15, 20.

Pursuant to 28 U.S.C. § 636(c)(1) and Federal Rule of Civil Procedure 73, the parties consented to magistrate judge jurisdiction. Doc. 12. After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

**ISSUES FOR REVIEW**

In this appeal, Plaintiff Pressnall argues that the court should reverse the Commissioner's decision because the Administrative Law Judge (ALJ) failed to properly evaluate the credibility of Pressnall's complaints under the "Eleventh Circuit Pain Standard," such that the ALJ's decision was not supported by substantial evidence. Doc. 19 at 5. Specifically, Pressnall argues that the record "does not provide substantial evidence to support the ALJ's determination that the Plaintiff would be capable of performing a range of light work on a sustained basis," because the ALJ did not consider all of the relevant evidence in making the decision, and instead selectively pulled from the record. Doc. 19 at 7, 11–16. Pressnall also argues that the ALJ improperly failed to consider Pressnall's inability to afford ongoing treatment due to lack of insurance. Doc. 19 at 10–11.

**STATUTORY AND REGULATORY FRAMEWORK**

A claimant applying for Social Security benefits bears the burden of proving disability. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages:  (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled.  The ALJ must determine the following:

(1)   whether the claimant is engaged in substantial gainful activity;

(2)   if not, whether the claimant has a severe impairment or combination of impairments;

(3)   if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)   if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)   if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211. At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person

would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.

# BACKGROUND

## A.     Plaintiff Pressnall's personal and medical history

Plaintiff Pressnall was born on November 8, 1960.  Doc. 13-4 at 2.  She was 58 years old when she applied for disability benefits.  Doc. 13-4 at 2.

Pressnall's employment history consists largely of retail management positions; from January 2015 to June 2017, she worked in management in a big-box retail store.  Doc. 13-7 at 2.

On July 31, 2018, Pressnall went to the DCH Health System Emergency Department with low back pain stemming from an injury in April 2018, which she stated was causing a new loss of bladder and bowel control.  Doc. 13-8 at 5.  She stated that her pain was at an intensity of 10 out of 10, which she then reduced to 5 out of 10.  Doc. 13-8 at 6–14.  The doctor who evaluated Pressnall noted that she reported having worsening low back pain that had become severe when she was gardening that morning and had tried to stand up.  Doc. 13-8 at 13.  The doctor noted that Pressnall reported that she had been "bedbound on and off for the past few months," but had not seen anyone due to lack of insurance, and that she had pain and numbness shooting down her legs, as well as bouts of incontinence.  Doc. 13-8 at 13.  Movement made Pressnall's pain worse, while remaining still alleviated it.  Doc. 13-8 at 14.  Pressnall had no neck pain or trouble moving her neck; she only had low back pain and tenderness.  Doc. 13-8 at 16–17.  Pressnall had an antalgic gait and

"decreased soft touch sensation in the saddle area and anterior thighs," but 5 out of 5 strength in her extremities.  Doc. 13-8 at 17.

An MRI also conducted on July 31, 2018, showed degenerative changes in Pressnall's lower spine, along with disc bulges, but no definite neural impingement. Doc. 13-8 at 17–18.  Pressnall was given pain medication and transferred for a neurological evaluation.  Doc. 13-8 at 11–12.

On August 8, 2018, Pressnall saw chiropractor Dr. Todd Fetter at Spinal Care and Wellness, Inc. in Winfield, Alabama.  Doc. 13-8 at 59.  Pressnall presented with pain in her lower back, left hip and leg, and neck.  Doc. 13-8 at 59.  After performing chiropractic tests that indicated "imbalances" in Pressnall's spine, Dr. Fetter stated that Pressnall's prognosis was "guarded and uncertain at this time," but treatment goals included relief of symptoms and increased function.  Doc. 13-8 at 59–60.

On August 14, 2018, Pressnall saw Dr. Garry Magouirk, a primary care physician, seeking anti-inflammatory medication and muscle relaxers for her back. Doc. 13-8 at 80.  Pressnall stated that Robaxin medication had not been helping, and that Flexaril had helped a little.  Doc. 13-8 at 80.  Dr. Magouirk noted that a surgeon had found that Pressnall's back pain did not seem to be "surgical in nature."  Doc. 13-8 at 80.  Dr. Magouirk noted that Pressnall's care plan included considering referral to a pain clinic for evaluation for lower back injections.  Doc. 13-8 at 81.

On January 13, 2019, after a fall, Pressnall went to the DCH Emergency

Department with a nasal fracture, headache, nausea, dizziness, and chest pain.  Doc. 13-8 at 25, 28–29.  Pressnall did not complain of low back pain or incontinence.  Doc. 13-8 at 25, 28–29.  Pressnall did report a past history of back problems.  Doc. 13-8 at 36.  She stated that she was experiencing face and neck pain at an intensity of 8 out of 10 and had mobility problems.  Doc. 13-8 at 41.  She reported no vertebral tenderness and painless range of motion, and had no motor weakness.  Doc. 13-8 at 48.  An MRI showed no fracture in Pressnall's neck and only moderate degenerative changes in her cervical spine.  Doc. 13-8 at 50.  Pressnall also reported right hip pain due to her fall, but examination showed no significant abnormality.  Doc. 13-8 at 54.

On January 17, 2019, Pressnall returned to Dr. Fetter stating that she felt worse since her last visit because of her fall.  Doc. 13-8 at 61.  Dr. Fetter stated that Pressnall had suffered a "set back in her care due to an exacerbation causing an increase in her symptomatology," and stated that the goal of continued treatment would be "relief of symptoms and increase[d] function."  Doc. 13-8 at 61.

On January 28, 2019, Pressnall saw Dr. Magouirk for a follow-up after her fall.  Doc. 13-8 at 75.  Pressnall reported that her neck was still "very sore and swollen," that she had gone to a chiropractor but had "no relief in [her] neck," and that she had left lower back soreness radiating to her abdomen.  Doc. 13-8 at 75.  Pressnall stated that she already had Flexaril and Robaxin medications at home.  Doc. 13-8 at 75.  Dr. Magouirk noted that Pressnall had chronic low back pain, but

only recommended lifestyle changes related to hypertension.  Doc. 13-8 at 76.

In a function report filled out in March 2019, Pressnall reported that she lived in a house with her husband, and that her days consisted of getting up to go to the couch, going back and forth to the porch, and having her husband take her to her chiropractor once a week.  Doc. 13-7 at 34–35, 41.  She stated that she would try to cook once a week, but could not be on her feet for more than 5 minutes at a time, and it took her 15 to 45 minutes to cook.  Doc. 13-7 at 35–36.  She stated that she had not been able to do any household chores since January 13, 2019, because of her back pain and neck sprain.  Doc. 13-7 at 36–37.  Pressnall stated that her neck injury would not let her drive because she could not look both ways, and that her low back did not tolerate long car trips.  Doc. 13-7 at 37.  She also stated that she shopped for groceries—namely toilet paper and paper towels—twice a month.  Doc. 13-7 at 37.  She stated that, since her neck injury, she "could not do much of anything" and was "homebound" because it was "too painful to get around."  Doc. 13-7 at 38–39.

On April 20, 2019, Pressnall saw Dr. Adebimpe Oyowe at Med Plus in Jasper, Alabama, for an evaluation related to her disability proceedings.  Doc. 13-8 at 83.  Pressnall was driven to the office for the exam.  Doc. 13-8 at 83.  Dr. Oyowe examined Pressnall regarding her alleged back and neck pain.  Doc. 13-8 at 83.

Dr. Oyowe noted that Pressnall had multiple areas of musculoskeletal pain, with the most severely affected area being her lumbar vertebrae, and had urinary

incontinence.  Doc. 13-8 at 84.  Dr. Oyowe stated that Pressnall reported that she could walk up to a mile on level ground and could dress herself, but had difficulty standing for 5 to 15 minutes and was not able to climb stairs or perform household chores.  Doc. 13-8 at 84.

Dr. Oyowe noted that Pressnall had difficulty getting up and out of a chair and on and off the exam table.  Doc. 13-8 at 85.  He noted that Pressnall ambulated with difficulty and had an abnormal and antalgic gait, but did not require an assistive device to walk.  Doc. 13-8 at 85.  Pressnall reported to Dr. Oyowe that she could not walk on her toes or on her heels because her pain made her fear falling; she also had difficulty squatting and bending over to touch her toes because of her pain.  Doc. 13-8 at 86.

Pressnall had normal grip strength in both hands, normal thought process, and no muscular atrophy.  Doc. 13-8 at 86.  Pressnall did not have full range of motion in her extremities because she had limited range of motion in her hips, though her other range of motion was within normal limits.  Doc. 13-8 at 87.  Dr. Oyowe noted that Pressnall verbalized severe pain from her January 2019 fall and "heavy lifting" in April 2018, but spinal imaging did not "show any fracture or severe spine disease."  Doc. 13-8 at 87.

Dr. Oyowe noted that the exam was "limited by pain," but that Pressnall's strength was "actually 5/5 when patient is encouraged to complete tasks."  Doc. 13-

8 at 87.  Dr. Oyowe stated that Pressnall had "muscle tightening and likely spasms" that hindered her function, but that she had a "good prognosis with physical therapy" because there was no actual physical or nerve damage.  Doc. 13-8 at 87.  Dr. Oyowe also noted that, while Pressnall stated that she had limited range of motion in her neck, she appeared to have full range of motion when she did not know that she was being observed.  Doc. 13-8 at 87.

Based on Pressnall's history and the examination, Dr. Oyowe stated that Pressnall had limitations in standing and could only stand occasionally in an 8-hour workday, could sit continually in an 8-hour workday, could walk occasionally in an 8-hour workday, had limited ability to bend or stoop due to back spasms, and could only carry less than 5 pounds continually.  Doc. 13-8 at 87.

On May 30, 2019, Pressnall returned to the DCH Emergency Department with high blood pressure, nausea, vomiting, and diarrhea.  Doc. 13-8 at 89.  Pressnall reported a history of back problems and a neck injury from her fall, but at times did not report any pain and at other times reported pain at a level of 4 out of 10.  Doc. 13-8 at 90–93, 96–97.  Pressnall had normal range of motion and sensation with no musculoskeletal tenderness.   Doc. 13-8 at 96.   Pressnall did not report any musculoskeletal symptoms.  Doc. 13-8 at 103.

On June 27, 2019, Pressnall saw her chiropractor, Dr. Fetter.  Doc. 13-8 at 113.  Pressnall told Dr. Fetter that her lumbar pain was worse since her last visit, and

Dr. Fetter noted that her "set back" (her fall) had increased her symptomatology. Doc. 13-8 at 113. He stated that the plan of treatment included continuing to attempt to relieve symptoms and increase function. Doc. 13-8 at 113.

On July 18, 2019, Pressnall presented to the Northwest Medical Center Emergency Department with lumbar pain at an intensity of 8 out of 10, numbness in her legs, and difficulty having a bowel movement. Doc. 13-8 at 114–17. The treatment notes indicate that Pressnall had known disc disease and a chronic condition that was "alleviated by nothing," but aggravated by "bending, coughing, movement, [and] walking." Doc. 13-8 at 118. Pressnall had normal full range of motion. Doc. 13-8 at 119. Pressnall's back pain was noted as moderate with painful range of motion and muscle spasm. Doc. 13-8 at 119. Imaging showed no fracture or compression deformity with "mild" degenerative disc changes and bulges. Doc. 13-8 at 122.

On July 25, 2019, Dr. Fetter submitted a letter to Pressnall's attorney, stating that Pressnall needed ongoing chiropractic care because she had done very well with chiropractic care until her fall in January 2019, but that after her fall her back and hip joints could not tolerate unusual stress or strain. Doc. 13-8 at 112. Dr. Fetter stated that degenerative changes were inevitable, that Pressnall had "difficulty with certain activities of daily living which will likely require additional therapies to improve," and that in his professional opinion her daily activity "will be severely

limited." Doc. 13-8 at 112.

**B.     Social Security proceedings**

**1.     Initial application and denial of benefits**

In February 2019, Pressnall filed an application for Supplemental Security Income Benefits and Disability Insurance Benefits, alleging disability onset from January 1, 2018. Doc. 13-4 at 39, 41; Doc. 13-6 at 2, 9. Pressnall alleged that she suffered from back pain and neck pain. Doc. 13-4 at 3.

In May 2019, Pressnall's disability insurance benefits claims were initially denied because, based on the evidence presented, Pressnall did not qualify as disabled. Doc. 13-4 at 18, 36. Dr. Robert Haas opined as part of the denial of Pressnall's application that she could occasionally lift or carry 20 pounds, could frequently lift or carry 10 pounds, could stand or walk about 6 hours in a normal 8-hour workday, could sit about 6 hours in an 8-hour workday, could push or pull, could climb ramps occasionally, and could balance, kneel, crouch, and crawl. Doc. 13-4 at 14–16, 33–35. Pressnall's application for disability benefits were denied because she had the capacity to perform her prior relevant work. Doc. 13-4 at 18, 36.

On May 20, 2019, Pressnall requested a hearing with an ALJ. Doc. 13-5 at 15–17.

### 2. ALJ hearing

On May 13, 2020, the ALJ conducted a telephonic hearing to determine if Pressnall was disabled.  Doc. 13-3 at 26.

At the hearing, Pressnall testified that she had "severe lower back pain" that extended down her legs and "internal numbness that causes incontinence."  Doc. 13-3 at 32.  She testified that she had been experiencing severe back pain on a daily basis since April 2017, that her "right leg will give out occasionally," and that she "can't feel most of the toes on her right foot."  Doc. 13-3 at 32–33.

Pressnall testified that her pain makes being on her feet—for instance, while washing dishes—"about the toughest thing [she] can do."  Doc. 13-3 at 33.  She testified that it is "extremely uncomfortable" to stand, and that she uses a stool when she does tasks like cooking or washing dishes.  Doc. 13-3 at 33.  Pressnall testified that she could stand for about 5 or 10 minutes, and that she is "restless" and "all around uncomfortable" when she sits down, such that she has to "be on something fairly padded."  Doc. 13-3 at 33.  Pressnall testified that she could lift "probably ten pounds" and could walk 100 yards at most before needing to sit.  Doc. 13-3 at 34.

Pressnall testified that she took "a lot of anti-inflammatories" and used ice, heat, and leg elevation to manage her pain.  Doc. 13-3 at 34.  Pressnall testified that she could stand for maybe an hour and a half total on a good day, and typically spent the remainder of her day crocheting, reading, watching the television, or doing word

14

puzzles to "keep her mind busy." Doc. 13-3 at 34. Pressnall stated that she could not tolerate narcotics for pain. Doc. 13-3 at 35.

Pressnall testified that she did not have insurance and could not afford to see a doctor on a regular and consistent basis. Doc. 13-3 at 35. She stated that the only doctor she had seen who "was actually helping" was her chiropractor. Doc. 13-3 at 35.

Pressnall also testified that she was born on November 8, 1960, was 59 years old, had graduated high school and trade school, and lived alone. Doc. 13-3 at 35–36. Pressnall testified that she had not worked since June 2017 because she "can't stay on [her] feet long enough," but then testified that the reason for her termination from her last job was that her father passed away and she was taking off too much time. Doc. 13-3 at 37. She testified that she could only sit for about 10 minutes before the pain became too bad and she had to stand up or lie down. Doc. 13-3 at 37.

Pressnall testified further that she had previously worked as a retail store manager. Doc. 13-3 at 37–41.

Robert Moseley, a vocational expert, then testified that there were jobs in the national economy that a person with Pressnall's limitations could perform. Doc. 13-3 at 41–45. The vocational expert testified that a person with the limitations described by Pressnall would not be able to return to any of her past occupations, as

15

they had been described, because those occupations required following simple, routine one- and two-step instructions.  Doc. 13-3 at 45.  The vocational expert testified that the positions would require Pressnall to focus, concentrate, and attend for two-hour periods, be off task no more than 10% of the time, and only be absent one day per month at most.  Doc. 13-3 at 46.

### 3.    ALJ decision

On May 29, 2020, the ALJ entered an unfavorable decision.  Doc. 13-3 at 11–21.

In the decision, the ALJ found that Pressnall met the requirements for insured status through December 31, 2022.  Doc. 13-3 at 16.  The ALJ found that Pressnall had "not been under a disability within the meaning of the Social Security Act from January 1, 2018, through the date of [the] decision."  Doc. 13-3 at 15, 20.

The ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. §§ 404.1520(a), 416.920(a); *see Winschel*, 631 F.3d at 1178), and found that Pressnall met the first three prongs of the test.  Doc. 13-3 at 15–17.  Specifically, the ALJ found that Pressnall was insured through December 31, 2022, that she had not engaged in substantial gainful activity since the alleged onset date of January 1, 2018, and that she had severe impairments of "degenerative disc disease and obesity."  Doc. 10-3 at 16.  The ALJ determined that Pressnall did not have an impairment or combination of impairments that met or medically equaled the

16

severity of one of the impairments listed in applicable Social Security regulations. Doc. 13-3 at 17.

The ALJ also determined Pressnall's RFC, finding that she could "perform light work" except that she could only occasionally stoop or crouch, could not perform "lower-extremity pushing or pulling," and could only occasionally climb ladders, ramps, or scaffolding. Doc. 13-3 at 17. The ALJ determined that Pressnall was able to "focus concentrate and attend for two hour periods." Doc. 13-3 at 17. The ALJ's decision stated that the ALJ had considered all of Pressnall's symptoms and the extent to which they reasonably could be accepted as consistent with the evidence. Doc. 13-3 at 17. The ALJ's decision also stated that the ALJ had considered medical opinions and prior administrative medical findings. Doc. 13-3 at 17.

In assessing Pressnall's RFC and the extent to which her symptoms limited her function, the ALJ's decision stated that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations." Doc. 13-3 at 17. The ALJ then provided an exhaustive recounting of Pressnall's medical records. Doc. 13-3 at

17–20.

The ALJ determined that Pressnall was not disabled.  Doc. 13-3 at 19.  The ALJ stated that Pressnall was limited to work at the light exertional level with some restrictions.  Doc. 13-3 at 19.  The ALJ stated that Pressnall had "little in the way of medical evidence to support disability."  Doc. 13-3 at 19.  The ALJ found that Pressnall had complained of neck and back pain and that imaging showed "some degeneration," but emphasized that her strength had "remained 5/5" and that she had been observed with full range of motion in her neck after complaining of limited range of motion.  Doc. 13-3 at 19.  The ALJ stated that "the claimant testified that she could walk up to 100 yards; however, she told Dr. Oyowe that she could walk a mile."  Doc. 13-3 at 19.  The ALJ found that Dr. Oyowe's examination found no physical or nerve damage, despite Pressnall's testimony about significant pain.  Doc. 13-3 at 19.

The ALJ also found that the objective evidence did not support extreme restrictions for Pressnall, but did support a limitation to the light exertional level.  Doc. 13-3 at 19.  The ALJ found that Pressnall was able to care for her personal needs and shop for groceries, and that her degeneration level had been described as moderate at most, so there was no need for a limitation requiring work at the sedentary level.  Doc. 13-3 at 19.  The ALJ found that crouching and stooping, pushing and pulling with lower extremities, and climbing all should be limited.  Doc.

13-3 at 19.  The ALJ also found that Pressnall's pain and medication could possibly interfere with her ability to concentrate at times, but that "there is nothing in the record to suggest that [Pressnall] would be unable to focus, concentrate, or attend for 2-hour periods of time."  Doc. 13-3 at 19.  The ALJ considered Pressnall's obesity according to Social Security Ruling (SSR) 19-2p, and found that even with the effects of her obesity Pressnall still could perform work at the light and sedentary exertional levels.  Doc. 13-3 at 20.

The ALJ's decision stated that the ALJ had considered all medical and previous administrative opinions, but could not defer or give specific weight to any medical opinions.  Doc. 13-3 at 20.  The ALJ found that the 2019 letter from Dr. Fetter was not persuasive because it was vague and failed to specify clear limitations. Doc. 13-3 at 20.  The ALJ found Dr. Oyowe's opinion not persuasive, "particularly as it relates to the claimant's ability to lift and carry," because Pressnall's full range of motion in her neck when she was not observed suggested "some exaggeration of symptoms," and because the report provided no clear basis for an extreme limitation on lifting and carrying.  Doc. 13-3 at 20.  The ALJ found persuasive the state agency opinions, which found that Pressnall could perform work at the light exertional level, because those opinions were "more consistent with the overall evidence."  Doc. 13-3 at 20.

The ALJ further determined at step four that Pressnall was capable of

performing her past relevant work as a manager because, based on the testimony of the vocational expert, the work did not require the performance of work-related activities that Pressnall's RFC precluded.  Doc. 13-3 at 20.  Accordingly, the ALJ determined that Pressnall was not disabled from January 1, 2018, through the date of the decision (May 29, 2020).  Doc. 13-3 at 20.

### 4.      Appeals Council decision

Pressnall requested that the SSA Appeals Council review the ALJ's decision. Doc. 13-3 at 2.  On October 15, 2020, the Appeals Council denied Pressnall's request for review, finding no reason to review the ALJ's decision.  Doc. 13-3 at 1–3. Because the Appeals Council found no reason to review the ALJ's opinion, the ALJ's decision became the final decision of the Commissioner.

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards.

## I.      The ALJ's decision properly was based on the multi-part "pain standard."

As an initial matter, the ALJ's decision properly was based on the multi-part "pain standard."  When a claimant attempts to establish disability through her own testimony concerning pain or other subjective symptoms, the multi-step "pain standard" applies.  That "pain standard" requires (1) "evidence of an underlying

medical condition," and (2) either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also* 20 C.F.R. § 404.1529 (standards for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting effects of [her] symptoms," and "evaluate [those] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant is] disabled." 20 C.F.R. § 404.1529(c)(4); *see Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, the ALJ's decision articulated and tracked that controlling legal standard. In analyzing Plaintiff Pressnall's RFC, and the extent to which Pressnall's symptoms limited her functioning, the ALJ's decision reasoned that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations." Doc. 13-3 at 17. Thus, the ALJ's decision was based on the proper

legal standards.

## II. Substantial evidence supported the ALJ's decision to discredit Pressnall's subjective testimony regarding her pain.

Substantial evidence supported the ALJ's decision not to credit Pressnall's subjective testimony regarding her pain.

### A. The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony. *Wilson*, 284 F.3d at 1225. A claimant can establish that she is disabled through her "own testimony of pain or other subjective symptoms." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [those] symptoms have" on the claimant's ability to work "solely because the available objective medical evidence does not substantiate [those] statements." 20 C.F.R. § 404.1529(c)(2).

So, when an ALJ evaluates a claimant's subjective testimony regarding the intensity, persistence, or limiting effects of her symptoms, the ALJ must consider all of the evidence, objective and subjective. 20 C.F.R. § 404.1529. Among other things, the ALJ considers the nature of the claimant's pain and other symptoms, her

precipitating and aggravating factors, her daily activities, the type, dosage and effects of her medications, and treatments or measures that she has to relieve the symptoms. *See* 20 C.F.R. § 404.1529(c)(3).

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if the ALJ decides to discredit a claimant's subjective testimony "about the intensity, persistence, and limiting effects of [her] symptoms." 20 C.F.R. § 404.1529(c)(4). If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see Mitchell v. Commissioner of Soc. Sec.*, 771 F.3d 780, 792 (11th Cir. 2014) (similar). "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable . . . [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer*, 395 F.3d at 1210 (quotation marks and alterations omitted).[1] "The question is not . . . whether [the]

---

[1] The Social Security regulations no longer use the term "credibility," and have shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of

ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

**B.    The ALJ properly explained the decision not to credit Pressnall's subjective testimony regarding her pain, and substantial evidence supported that decision.**

The ALJ properly explained the decision to discredit Pressnall's subjective testimony regarding her pain, and substantial evidence supported the ALJ's decision. Not only did the ALJ's decision articulate and track the multi-part "pain standard" (*see* Part I *supra*), but also the ALJ's decision tracked the Eleventh Circuit law and applicable regulations for evaluating a claimant's subjective testimony (discussed above in Part II.A *supra*).

The ALJ's decision stated that the ALJ "ha[d] considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p." Doc. 13-3 at 17. As explained above, 20 C.F.R. § 404.1529—one of the regulations cited in the ALJ's decision, Doc. 13-3 at 17—

---

the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Hargress*, 883 F.3d at 1308 (quoting SSR 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)). But, generally speaking, a broad assessment of "credibility" still can apply where the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record. *Id.* at 1308 n.3.

requires that "[t]here must be objective medical evidence from an acceptable medical source that shows [a claimant] ha[s] a medical impairment[] which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529; *accord Wilson*, 284 F.3d at 1225 (requiring that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms).

Here, the ALJ did not *explicitly* state whether Pressnall had shown evidence of an underlying medical condition and either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms. *See* Doc. 13-3 at 19; *Wilson*, 284 F.3d at 1225; 20 C.F.R. § 404.1529.

But the lack of that explicit finding does not provide any basis for reversal. Arguably, that finding is *implicit* in the ALJ's decision, because without a determination that Pressnall's medical conditions could reasonably be expected to give rise to the alleged symptoms, there was no reason for the ALJ to proceed to the next part of the pain standard—i.e., to assess the intensity, persistence, and limiting effects of Pressnall's symptoms. Alternatively, the ALJ assumed without deciding that Pressnall's medically determinable impairments could be expected to cause the alleged pain. Practically speaking, in either event, the ALJ's decision lightened

25

Pressnall's burden to establish disability, and any error was "harmless." *See*

*Washington v. Saul*, No. 4:19-CV-00462-MHH, 2020 WL 5658905, at *4 (N.D. Ala.

Sept. 23, 2020) (finding that the ALJ's failure to articulate whether the claimant's

impairments could cause the claimant's alleged pain was harmless).

Regardless, the ALJ's decision assessed the intensity, persistence, and

limiting effects of Pressnall's symptoms (Doc. 13-3 at 19), and articulated explicit

and adequate reasons for discrediting Pressnall's testimony. *See Holt*, 921 F.2d at

1223. That decision was supported by substantial evidence. So, even if the ALJ

explicitly had found that Pressnall's objectively determined medical conditions

could reasonably be expected to give rise to her alleged symptoms, the ALJ's

decision still would have been the same. (And, if the ALJ instead explicitly had

found that Pressnall's objectively determined medical conditions could *not*

reasonably be expected to give rise to her alleged symptoms, then that would have

been an additional, alternative basis for the ALJ's unfavorable decision.)

The ALJ found both that Pressnall had "little in the way of medical evidence

to support disability," and that "the claimant's pain is not supported by objective

evidence." Doc. 13-3 at 19. The ALJ relied on the facts that imaging showed only

"some degeneration," and that Pressnall maintained 5 out of 5 strength. Doc. 13-3

at 19. The ALJ also found that Dr. Oyowe reported that there was no physical or

nerve damage underlying Pressnall's alleged pain, and that her degeneration had

been described as "moderate at most."  Doc. 13-3 at 19.[2]  The ALJ found that the objective medical evidence did not support Pressnall's subjective testimony regarding extreme limitations or restrictions, but instead supported only a limitation to the light exertional level.  Doc. 13-3 at 19.

The ALJ also did not reject Pressnall's testimony solely because of a lack of medical evidence or because the available objective medical evidence did not substantiate Pressnall's statements.  *See* 20 C.F.R. § 404.1529(c)(2).  Rather, the ALJ considered the evidence and articulated specific reasons not to credit Pressnall's subjective testimony.  The ALJ found that Pressnall had been observed with full range of motion in her neck, despite asserting limited range of motion.  Doc. 13-3 at 19.  The ALJ also found other inconsistencies in Pressnall's testimony, stating that Pressnall testified at her hearing that she could walk only 100 yards, but told Dr. Oyowe that she could walk a mile.  Doc. 13-3 at 19.  The ALJ found further that Pressnall could care for her personal needs and shop for groceries.  Doc. 13-3 at 9.

---

[2] Pressnall argues that the ALJ erred in finding Dr. Oyowe's opinion unpersuasive because the ALJ focused only on parts of Dr. Oyowe's report and did not consider, among other things, Pressnall's gait and movement.  Doc. 19 at 12–13.  However, the ALJ's decision shows that the finding that Dr. Oyowe's opinion was unpersuasive referred specifically to Pressnall's ability to carry, and that the ALJ nevertheless *did* rely on other parts of Dr. Oyowe's opinion.  Doc. 13-3 at 19–20.  For example, in making the disability determination, the ALJ considered Dr. Oyowe's statements that he had observed Pressnall with a full range of motion in her neck, that Pressnall had told Dr. Oyowe that she could walk a mile, and that Dr. Oyowe had found "no physical or nerve damage."  Doc. 13-3 at 19.  The ALJ relied on all of that evidence in determining Pressnall's limitations.  Doc. 12-3 at 19.

In addition, Pressnall argues that the ALJ erred by "plac[ing] improper emphasis on the fact that the Plaintiff had not sought ongoing medical treatment." According to Pressnall, the ALJ's decision violated SSR 96-7p, which provides that an ALJ cannot draw inferences from a failure to seek regular medical care without considering potential explanations—for example, a lack of insurance.  Doc. 19 at 10–11.  As a preliminary matter, the record shows that Pressnall did seek care from Dr. Fetter at least somewhat regularly.  *See* Doc. 13-8 at 59–61, 112–13.  More importantly, the ALJ did not focus on the lack of ongoing treatment; instead, the ALJ focused on the lack of objective evidence of injury supporting Pressnall's subjective testimony of pain and the evidence that that called into question her credibility.  Doc. 13-3 at 19.  In fact, the ALJ not only cited SSR 16-3p—which instructs an ALJ about how to consider an individual's symptoms—but also gave a detailed recounting of Pressnall's medical history, including her subjective complaints of pain.  Doc. 13-3 at 17–19.

Furthermore, the ALJ did not entirely discredit Pressnall's testimony about suffering pain, but instead found that the record *did* support limitations to the light exertional level to accommodate her pain and numbness.  Doc. 13-3 at 19.

In short, the ALJ gave a detailed and specific explanation of why Pressnall's testimony about the limitations caused by her symptoms was not consistent with the record; the ALJ did not simply present a broad rejection of Pressnall's testimony.

28

*See Dyer*, 395 F.3d at 1210.  Thus, the ALJ's decision included the necessary "explicit and adequate reasons" for discrediting Pressnall's subjective testimony that she could not work, and also accounted for Pressnall's subjective testimony regarding her pain in the RFC determination.  *Wilson*, 284 F.3d at 1225.  The ALJ's decision in this case reflects a review of the record in its entirety, not a few "cherry-picked" facts.  *See, e.g.*, *Williams v. Saul*, No. 5:18-cv-01464-GMB, 2020 WL 733815, at *14 (N.D. Ala. Feb. 13, 2020) (reasoning that "cherry-picking is forbidden" when an ALJ is assessing the record).

In this regard, substantial evidence supported the ALJ's decision.  Among other things, Pressnall reported on a function report that she was able cook for 15 to 45 minutes, though she needed to use a stool to sit down every 5 minutes, and that she could shop for groceries about twice a month.  Doc. 13-7 at 35–37.  She also testified at her hearing that she could cook and wash dishes, if she used a stool and could sit on a padded surface.  Doc. 13-3 at 33.  Additionally, at the time of her hearing, Pressnall lived alone and took care of herself.  Doc. 13-3 at 35–36.  Thus, Pressnall's ability to perform some tasks with limitations provided evidence supporting the ALJ's decision that, while Pressnall had limitations, those limitations did not entirely preclude working.

Further, while Pressnall reported for her back pain to multiple emergency departments, a primary care physician, and a chiropractor, her testimony must be

taken in context of the facts that multiple instances of imaging showed some degenerative changes and disc bulges, but no clear indication of neural impingement or other injury to her back.  Doc. 13-8 at 17–18, 50, 54, 87, 112.  In addition, a surgeon's assessment indicated that Pressnall's pain was not caused by any injury or problem that could be fixed with surgery.  Doc. 13-8 at 80.  Plus, on multiple occasions, Pressnall presented at the emergency room with other issues and did not complain of back pain.  Doc. 13-8 at 25, 28–29, 96, 103.  Pressnall also exhibited full strength and range of motion on multiple occasions.  Doc. 13-8 at 48, 96, 119.  That evidence undercuts her testimony about the constant severity of her pain.

The evidence from Pressnall's chiropractor (Dr. Fetter), which arguably presented some compelling evidence of Pressnall's issues with back pain, still did not establish that Pressnall was so limited by her pain that she could not work.  In August 2018, Dr. Fetter stated that Pressnall's prognosis was "guarded and uncertain," but did not specify any limitations; instead, Dr. Fetter proceeded with treatment in hopes of improving her symptoms.  Doc. 13-8 at 59–60.  Even after the fall that purportedly caused Pressnall's neck pain, Dr. Fetter stated only that Pressnall had suffered a setback, and that the continued goal of treatment would be relief of symptoms and increased function.  Doc. 13-8 at 61, 113.  Dr. Fetter's letter to Pressnall's counsel still posed the possibility of improvement—noting that Pressnall's condition had previously improved with chiropractic care, but that she

would require additional therapies.  Doc. 13-8 at 112.  Dr. Fetter stated only that Pressnall would have "difficulty" with daily activities and that her activities would be "severely limited," but did not provide any specifics to suggest why Pressnall would be completely unable to work.  Doc. 13-8 at 112.  As the ALJ found, that opinion is too vague to be useful in determining Pressnall's functional limitations. Doc. 13-3 at 20.  Thus, Dr. Fetter's records provide little evidence to support the extreme pain and limitations about which Pressnall testified.

Dr. Oyowe's examination of Pressnall also supports the ALJ's decision. Pressnall told Dr. Oyowe that she had difficulty standing for 5 to 15 minutes or performing chores, but also said that she could walk a mile.  Doc. 13-8 at 84.  While Pressnall had some difficulty ambulating, she did not need an assistive device.  Doc. 13-8 at 85–86.  Pressnall had normal strength, no muscle atrophy, and largely normal range of motion.  Doc. 13-8 at 86–87.  Dr. Oyowe reported that there was a good prognosis for Pressnall with physical therapy because of the lack of physical or nerve damage underlying her purported symptoms.  Doc. 13-8 at 87.

Importantly, Dr. Oyowe also observed that Pressnall performed better when encouraged to complete tasks, and that she had full range of motion in her neck when she did not know she was being observed, despite reporting limited range of motion—facts suggesting possible exaggeration of Pressnall's symptoms and calling into question her credibility.  Doc. 13-8 at 87.  Likewise, other instances of

inconsistent testimony in the record undermined Pressnall's credibility.  Pressnall told Dr. Oyowe that she could walk a mile (Doc. 13-8 at 84), but testified at her hearing before the ALJ that she could walk 100 yards at most (Doc. 13-3 at 34).  She also testified at her hearing that she had left her previous job because of her pain and inability to work on her feet, but then stated that she actually had been taking off too much time because her father had passed away.  Doc. 13-3 at 37.

The contradictions within Pressnall's own testimony and between her testimony and the record support the ALJ's decision not to credit Pressnall's testimony about the persistence, intensity, and limiting effects of her pain.  The record contains sufficient evidence calling into doubt Pressnall's testimony, and the ALJ was not "clearly wrong" to discredit the testimony.  *See Werner*, 421 F. App'x at 939.

In sum, there is sufficient evidence in the record based on which a reasonable person would accept the ALJ's finding that Pressnall's testimony was not consistent with the record.  *See Crawford*, 363 F.3d at 1158 (where there is substantial evidence, a court must affirm the ALJ's decision, "[e]ven if the evidence preponderates against the Commissioner's findings" (quoting *Martin*, 894 F.2d at 1529)).  Accordingly, substantial evidence supported the ALJ's decision.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the court

**AFFIRMS** the Commissioner's decision.   The court separately will enter final judgment.

       **DONE** and **ORDERED** this August 18, 2022.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE